IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                                                                          No. 11 CR 1947 MV

KENNETH MIKOLON,

       Defendant.

### MEMORANDUM OPINION AND ORDER

THIS MATTER comes before the Court on Defendant's Motion to Suppress (Doc. 14),

Motion to Dismiss for Violation of the Interstate Agreement on Detainers Act (Doc. 15), and

Motion to Dismiss for Pre-Accusatory Delay (Doc. 24). The Court conducted an evidentiary

hearing on these motions on November 9, 2011. At the conclusion of the hearing, the Court

directed counsel to submit written closing arguments regarding the Motion to Suppress. The

parties filed their closing arguments on November 14, 2011. The Court has considered the

parties' briefs, arguments and evidence, as well as the relevant legal authority and finds that the

motions should be DENIED, with one exception regarding the Defendant's statements, for the

reasons stated herein.

### I.  FACTUAL BACKGROUND

On November 18, 2008, the Southwest Investigation Fugitive Task Force ("SWIFT")

received a lead from West Virginia that Kenneth Mikolon, a fugitive wanted for Failure to

Appear on a Sex Offense, was staying at the Elephant Butte State Park near Truth or

Consequences, New Mexico. SWIFT quickly put together a team, conducted an operational

meeting and devised a tactical plan to arrest Mikolon. Mots. Hr'g Tr. 28:23-29:2; 88:14-16;

160:1-4, November 9, 2011. The information received by SWIFT indicated that Mikolon was

"armed and dangerous." Tr. 159:25, 163:20-21. The team was also advised that Mikolon had first gone to Michigan where he obtained weapons, ammunition, camping gear and survival equipment before traveling to New Mexico. Tr. 89:5-8. They were advised that Mikolon was a military veteran and had worked as a prison guard. Tr. 89:9-12. They received a photo of Mikolon and his dog who was with him at the campground. Tr. 89:19-22. The SWIFT team was also advised that Mikolon had made statements to the affect of, "God told him not to go to that hearing. . .", and that he "would not be taken alive." Tr. 89:3-4; 92:7-8. The members considered the situation especially dangerous and Mikolon a "high threat target" for these reasons. Tr. 92:1-5; 116:3-5; Tr. 193:10-12.

After the initial meeting, the SWIFT team members drove to Truth or Consequences and gathered at the sheriff's office and then moved to the Elephant Butte Inn parking lot. Tr. 90:1-2, 12-14. There, they met with Park Ranger Manny Sanchez who identified Mikolon in the photograph as the individual staying in Elephant Butte State Park. Tr. 33:1-6; 90:2-7; 142:18-24. While the other officers were gearing up, Deputy Marshal Byron Hollister drove with Ranger Sanchez in the park ranger's vehicle to the campgrounds to see if they could locate Mikolon before moving in with the entire team. Tr. 33:8-13. Deputy Hollister and Ranger Sanchez saw Mikolon and his dog near his campsite. Tr. 33:8-13. They then went back to the group, reported they had identified Mikolon and made a plan on how they would approach Mikolon. Tr. 90:16-20.

At approximately 5:00 p.m., the SWIFT team approached Mikolon's camp in three separate vehicles. Tr. 91:12-15. The lead vehicle with Deputy Hollister and Deputy Sheriff Alan Franzoy stopped in position directly in front of Mikolon's truck. Tr. 91:16-17, 23-24. Upon seeing Mikolon, Deputy Hollister jumped out of his vehicle. Tr. 29:11-12. Deputy

Franzoy existed his side and provided cover for Deputy Hollister. Tr. 91:22-92:1.  The other officers immediately existed their vehicles and flanked the perimeter of the campsite to provide more protective cover.  Tr. 29:13-15; 92:1-4; 194:6-8.  When Mikolon was first spotted, he was walking from the direction of the shelter at his campsite towards his truck carrying a yellow bag.  Tr. 29:8-12; 161:17-18.  According to the officers' testimony, by the time the officers reached him, Mikolon was near the driver's side of his truck.  Tr. 29:20-24; 91:22-23; 92:16-17; 160:25.  Deputy Hollister ordered Mikolon to "put his hands up and turn around."  Tr. 29:15-16.  He then ordered Mikolon to get down on the ground.  Tr. 29:16; 94:21-25; 161:2-3.  Mikolon complied with the orders, raising his hands while holding the bag.  Tr. 92:23-25, 94:21-95:2; 161:4-5.  Mikolon dropped to his knees then went down to the ground, lying flat on his stomach with his arms outstretched.  Tr. 94:21-25.  At that point, Deputy Marshal Phillip Whittington approached Mikolon and handcuffed his hands behind his back.  Tr. 29:17; 100:1-3.  An officer removed the bag from Mikolon's hand and found a gun inside it.  Tr. 30:1-6; 95:8-15; 162:2-3.  Additionally, at the time of Mikolon's arrest, Deputy Hollister, Deputy Franzoy and Deputy Marshal John Hefley testified that the driver's side door to Mikolon's truck was open.  Tr. 29:22-24; 92:11-13; 93:4-5; 171:14-15.  A gun was visible in the driver's side door pocket.  Tr. 100:7-15; 171:14-15; Gov. Ex. 4.

Once Mikolon was in handcuffs, Deputy Hollister and Deputy Franzoy went to the shelter where Mikolon's tent was located to check and secure the area.  Tr. 31:9-16; 99:2-8.  The officers testified it took them approximately a minute to verify that no one else was at the campsite, before returning to the area where Mikolon was detained.  Tr. 31:17-18; 99:9-10.  While they were checking the campsite, Deputy Hefley and Deputy Whittington stayed with Mikolon.  Tr. 31: 9-11; 99:24-100:3; 162:14-15.  Deputy Hefley then asked Mikolon if he had

"any other items in his truck, weapons, money, drugs, anything like that." Tr. 163:8-9. Mikolon responded that "he had weapons in the truck." Tr. 163:11. Deputy Hefley then asked, "Do you mind if I go ahead and go inside and get those weapons? And [Mikolon] said, No." Tr. 163:12-13; 164:13-14. Mikolon then gave Deputy Hefley directions to where the guns were located in his truck, including in the toolbox in the bed of the truck. Tr. 31:18-21; 49:18-22; 101:17-19; 164:22-23; 165:6-9; 207:13-17; 208:7-10.

A total of seven guns were seized by the officers, including the gun in the bag Mikolon was carrying at the time of his arrest. Tr. 103:9-10. The officers seized the guns in plain view in the driver's side door pocket and another gun between the driver's seat and the center console. Tr. 101:9-16; 128:13-15; 135:22-25; 136:3-5. An AR-15 "long gun" was found on the floor board behind the driver's seat, a 12-gauge shotgun and a 7 millimeter magnum were found in the toolbox in the truck bed, and another gun was found in a bag located in the truck.[1] Tr. 103:9-24; 170:9-10; *see also* tr. 129:3-7; 164:22-165:14. Mikolon also had close to 1,000 rounds of ammunition, with loaded magazines located in several of the truck door pockets. Tr. 103:12-16.

Additionally, when the officers initially approached Mikolon to arrest him, an elderly Hispanic man who was staying at the campsite to the right of Mikolon's campsite, opened the door to his trailer to step out. Tr. 194:18-195:1. As he did, Deputy Marshal Jesse French "shut the door very quickly" and said he "believed [he] probably knocked him off balance." Tr. 195:2-3; *see* tr. 30:11-19. Due to the force with which he shut the door, Deputy French said it essentially popped back open. Tr. 198:21-199:1. At that point, he went into the trailer very

---

[1] Sheriff Deputy Franzoy testified, "if my memory serves me right, there was a weapon found in the glove box of this vehicle, as well." Tr. 128:20-22; *see* tr. 134:18-21. However, it appears the other gun was actually found in a bag located in the truck.

briefly to secure the area, at gunpoint, because of the situation.  Tr. 199:1-3.  He said he "noticed

there was an elderly man, who was scared."  Tr. 199:3-4.  He then told the man to stay in his

trailer.  Tr. 199:8-10.  Deputy French then stayed with the man for two to three minutes while

the other officers secured the area and put Mikolon in handcuffs.  Tr. 199:14-17.  While he was

with the man, he said he talked to him and was very apologetic because he believed he knocked

him back pretty hard when he shut the door.  Tr. 199:20-23.  Deputy French said he held the man

at the door of his trailer for three to five minutes total.  Tr. 200:1-4.  He said the door of the

man's trailer where they were standing was on the right side of the trailer facing away from the

scene of the arrest and Mikolon's campsite.  Tr. 195:23-24; 199:20; 200:6-8.  Deputy French

estimated the witness was approximately 40 to 60 feet from where Mikolon was arrested.[2]

Tr.195:25-196:2.  The officers testified that this gentlemen was the only non-law enforcement

witness present at that time.  Tr. 40:14-15; 128:4-6; 163:1-4.

Following Mikolon's arrest, he was transported to the Doña Ana County Detention

Center by Deputy French.  Tr. 197:10-11.  At no point during his arrest, was he advised of his

Miranda rights.  Tr. 205:7-10.

## I. MOTION TO DISMISS FOR VIOLATION OF INTERSTATE AGREEMENT ON DETAINERS ACT

The Interstate Agreement on Detainers Act (IADA) is an agreement entered into by the

States and the United States of America to "encourage the expeditious and orderly disposition"

of "charges outstanding against a prisoner" and the "determination of the proper status of any

and all detainers based on untried indictments, informations, or complaints."  18 U.S.C. App. 2,

---

[2]Deputy Hefley estimated the distance between the trailer and Mikolon at the time of his arrest to be 20 to 30 feet away.  Tr. 162:23.

§ 2, Art. I.  The IADA is also intended "to provide cooperative procedures" between the jurisdictions with regard to charges emanating from another jurisdiction.  *Id.*  Under the IADA, a prisoner is entitled to be brought to trial within 180 days after delivering notice of his or her request for a final disposition on the charges pending against him or her to the prosecutor's office and the appropriate court.  Section 2, Article III(a) of the IADA states the following:

> Whenever a person has entered upon a term of imprisonment in a penal or correctional institution of a party State, and whenever during the continuance of the term of imprisonment there is pending in any other party State any untried indictment, information or complaint, on the basis of which a detainer has been lodged against the prisoner, he shall be brought to trial within one hundred and eighty [180] days after *he shall have caused to be delivered to the prosecuting officer and the appropriate court* of the prosecuting officer's jurisdiction written notice of the place of his imprisonment and his request for a final disposition to be made of the indictment, information or complaint.

(Emphasis added).  If the case is not brought to trial within the time provided, the appropriate court of jurisdiction must dismiss the case with prejudice.  18 U.S.C. App. 2, § 2, Art. V(c).

In *Fex v. Michigan*, 507 U.S. 43 (1993), the Supreme Court ruled that the 180-day IADA time period does "not commence until the prisoner's request for final disposition of the charges against him [are] *actually* delivered to the trial court and prosecuting officer of the jurisdiction that lodged the detainer against him."  *Id.* at 52 (emphasis added).  *Fex* made clear that delivery to the court and prosecutor is "the critical event."  *Id.* at 43; *see also United States v. Martinez*, 376 F.Supp.2d 1168 (D.N.M. 2004) (following *Fex*, holding actual notice to both court and prosecutor of demand for speedy trial began IADA clock).  The Tenth Circuit strictly follows the holding in *Fex*.  In *United States v. Washington*, 596 F.3d 777, 781 (10th Cir. 2010), the Tenth Circuit held that *Fex* "specifically required actual delivery of a request to both the prosecutor and the court, and it refused to carve a 'fairness' exception to the express language of the IADA in cases in which a third party had negligently or maliciously prevented delivery from occurring."

The Tenth Circuit said it was "not unsympathetic" to the defendant in that case who had mailed copies to the Department of Justice, but that his argument was foreclosed by *Fex*. 596 F.3d at 781.

In this case, on January 24, 2011, Mikolon was in state custody in West Virginia serving a sentence for failure to appear. Tr. 7:8-12; 16:2-8. On that day, the records clerk, Tom Ritchie, called him to his office to notify him that a detainer had been lodged against him in New Mexico based upon a federal arrest warrant charging him in the instant case. Tr. 7:13-21; Gov. Ev. 1. Mr. Ritchie read Mikolon the entire detainer form, including the section advising him of his right to a speedy trial under the IADA. Tr. 7:13-21. Mikolon told Mr. Ritchie he wanted a speedy trial, signed the form and returned it to Mr. Ritchie.[3] Tr. 8:1-4; Gov. Ex. 1. After that, it appears Mr. Ritchie failed to forward the signed form to the appropriate authorities.

At some point, Mikolon filed a motion to dismiss the detainer in the Northern District of West Virginia. Tr. 8:22-9:8. He also said he called the Clerk's Office for the District of New Mexico to see if his case was pending on the docket, but did not receive any information. Tr. 9:9-20. Mikolon attempted to pursue his motion in West Virginia; but before it was determined, he was transferred to federal custody in Oklahoma. Tr. 10:2-4. Mikolon admits he did not send a request for speedy trial to the District Court in New Mexico (tr. 11:2-10), or to the U.S. Attorney's Office in New Mexico, as required. Tr. 11:24-12:1. He acknowledges realizing he "was wrong." Tr. 13:22. He also did not send anything to the U.S. Marshal's, but mistakenly believed Mr. Ritchie would deliver his signed detainer form to them. Tr. 12:2-8. Therefore, while the Court acknowledges that Mikolon relied in good faith upon the prison where he was in

---

[3] The detainer form signed by Mikolon requires him to circle whether he does or does not demand a speedy trial, which he failed to do. Gov. Ex. 1. Therefore, the form is not a clear request for a speedy trial.

custody to process his request for a speedy trial, and even took steps on his own to dismiss the detainer, albeit in the wrong court; there is not a good faith or fairness exception to the IADA requirements. *See Washington, supra.* Because Mikolon failed to comply with the strict notice procedures set forth in 18 U.S.C. App. 2, § 2, Art. III(a), his motion to dismiss the indictment against him must be denied in accordance with *Fex, supra.*

## II. MOTION TO DISMISS FOR PRE-ACCUSATORY DELAY

Mikolon asks the Court to dismiss the Indictment based upon a violation of the Due Process Clause of the Fifth Amendment. (Doc. 24 at 1.) Mikolon was arrested on the instant charges on November 18, 2008, but was not charged by Criminal Complaint until January 13, 2011, resulting in a delay of approximately two years and two months. He argues this delay resulted in his inability to "locate a witness who was present when Mikolon was arrested on November 18, 2008." (Doc. 24 at ¶ 7.) Mikolon described the witness as an elderly Hispanic man who drove a brown Dodge van. Tr. 17:14-15; 18:22. He said the man was a Vietnam veteran and ex-Marine who was staying at the campsite next to Mikolon's campsite at the park. Tr. 17: 14-15; 18:22-24. He also said that as a veteran, the man had a park pass, which he believed could be used to identify him. Tr. 53:10-15.

During Mikolon's arrest, he said he saw the man "sitting at his campsite" approximately 10 feet away from where Mikolon was arrested. Tr. 25:12-24. He said the man "came out of his campsite when my dog started barking when the marshals came up and the vehicles came up." Tr. 25:24-26:1. Later, Mikolon testified that "the first time I remember seeing him is when I was getting cuffed, and looked up and he was standing out there by the corner of the van." Tr. 51:15-18; *see* tr. 19:9-13. Mikolon said he believes the witness would have testified that the door to his truck was closed; and that he did not consent to search his truck. Tr. 19:1-8. However, due to

the delay in prosecution, he is unable to locate this witness.[4]

In addition to the loss of this witness, Mikolon says he has been harmed by the delay in prosecution by "[t]ime loss, memory loss. [The c]hance to be out there with my family right now." Tr. 19:14-18. He claims that if he had been indicted and tried earlier, then he possibly could have received a sentence that would have run concurrently with his sentence in West Virginia. Tr. 19:20-24. However, that is no longer a possibility because he completed his sentence in West Virginia in July of 2011. Tr. 19:20-20:7.

In *United States v. Lovasco*, 431 U.S. 783 (1977), the Supreme Court set forth the standard for courts to follow in determining whether pre-indictment delay warrants dismissal based upon a due process violation. The Supreme Court found that although "it is the statutes of limitations, which provide predictable, legislatively enacted limits on prosecutorial delay and provide the primary guarantee against bringing overly stale criminal charges; a statute of limitations does not fully define [defendants'] rights with respect to the events occurring prior to indictment." *Lovasco*, 431 U.S. at 789 (quoting *United States v. Marion*, 404 U.S. 307, 324 (1971) (internal citation and quotation marks omitted)). Therefore, "the Due Process Clause has a limited role to play in protecting against oppressive delay." *Id.* The Supreme Court held that dismissal for pre-accusatory delay requires a consideration of both actual prejudice and the reasons for the delay. *Id.* at 789. The reason prejudice alone is not enough is because "[a]ctual prejudice to the defense of a criminal case may result from the shortest and most necessary

---

[4] In his Motion to Dismiss for Pre-Accusatory Delay, Mikolon vaguely references other possibly lost witnesses who may have been in the area. (Doc. 24 at ¶ 13.) During the hearing, he mentions that a woman who drove a white Mazda RX-7 was staying at a campsite three sites away, and a gentleman who drove a black Dodge Dakota pickup truck was staying another two or three campsites down from the woman. Tr. 51:23-52:2. However, he does not say they were present or near his campsite during his arrest. Moreover, multiple officers testified that the elderly Hispanic man was the only non-law enforcement person in the area at the time of Mikolon's arrest. Tr. 32:4-9; 40:14-15; 128:4-6; 163:1-4.

delay; and no one suggests that every delay-caused detriment to a defendant's case should abort a criminal prosecution." *Id.* at 790 (citation omitted). Furthermore, the Supreme Court cautioned that the "Due Process Clause does not permit courts to abort criminal prosecutions simply because they disagree with a prosecutor's judgment as to when to seek an indictment. Judges are not free, in defining 'due process,' to impose on law enforcement officials our 'personal and private notions of fairness' and to 'disregard the limits that bind judges in their judicial function.'" *Id.* at 790 (citing *Rochin v. California*, 342 U.S. 165, 170 (1952)). The Supreme Court held that courts are "to determine only whether the action complained of . . . violates those 'fundamental conceptions of justice which lie at the base of our civil and political institutions,' and which define 'the community's sense of fair play and decency.'" *Id.* (internal citations omitted).

The decision in *Lovasco* remains the standard for lower courts to follow. In *United States v. Wood*, 207 F.3d 1222 (10th Cir. 2000), the Tenth Circuit held, "[w]hen seeking dismissal of an indictment based on pre-indictment delay, a defendant must establish the government intentionally delayed for tactical reasons and the delay caused him actual prejudice." *Id.* at 1234 (citing *United States v. Trammell*, 133 F.3d 1343, 1351 (10th Cir. 1998)). "Prejudice is demonstrated when the defendant has been 'meaningfully impaired in his ability to defend against the state's charges to such an extent that the disposition of the criminal proceeding was likely affected.'" *Jones v. Angelone*, 94 F.3d 900, 907 (4th Cir. 1996). "Vague and conclusory allegations of prejudice resulting from the passage of time and the absence of witnesses are insufficient to constitute a showing of actual prejudice." *Wood,* 207 F.3d at 1235 (quoting *Trammell*, 133 F.3d at 1351).

Here, the Court first considers the prejudice to Mikolon. It is true that a prompt

indictment may have enabled Mikolon to locate the elderly gentleman who was camping next to him at the time of his arrest.  However, Mikolon cannot demonstrate *actual* prejudice resulting from the loss of this potential witness.  Although Mikolon testified that the elderly man was either sitting at his campsite or standing near his van within ten feet of Mikolon's conversation with Deputy Hefley (tr. 25:12-24; 51:15-18), Officer French's testimony casts serious doubt on the veracity of Mikolon's statements.  Officer French testified that he detained the elderly man inside his trailer while Mikolon was being arrested and the area was being secured.  Tr. 199:1-200:4.  Furthermore, the door to the trailer where Officer French stayed with the man, faced away from the location where Mikolon was arrested (tr. 195:23-24; 199:20; 200:6-8), thereby limiting the witness's ability to observe the arrest.  Officer French estimated the witness was approximately 40 to 60 feet away from Mikolon.  Tr.195:25-196:2.  Therefore, based upon Officer French's testimony, it is doubtful that the witness could have heard whether Mikolon gave consent to Deputy Hefley; or could have seen the door to Mikolon's truck at the time of his arrest.  Thus, the utility of this witness's possible testimony to Mikolon is negligible.  Furthermore, even if the witness had been located and testified that Mikolon did not consent and the door to his truck was closed, there are other legal theories upon which the deputies were authorized to search Mikolon's truck as discussed herein.

Mikolon's second alleged prejudice concerns the additional time he may spend in custody due to the loss of his ability to seek a concurrent sentence.  However, this Court is required to assess prejudice on the basis of Mikolon's ability to meaningfully defend himself against the charges in this case.  *See Angelone*, 94 F.3d at 907.  Sentencing is a separate matter entirely.  Mikolon's allegation with respect to his sentence and time he may serve in custody is speculative and conclusory.  He cannot demonstrate actual prejudice.  *See Wood,* 207 F.3d at

11

1235 (quoting *Trammell*, 133 F.3d at 1351).

Finally, because Mikolon failed to demonstrate the delay in this case caused him actual prejudice, the Court need not consider whether the government "intentionally delayed for tactical reasons," since both criteria must be met.  Nevertheless, there is no evidence that the government intentionally delayed the prosecution of this case for tactical reasons.  Given the facts in this case that heavily favor the government, it would have little to gain by delaying prosecution.  Furthermore, there is no evidence of intentional conduct on the part of the government.  Mikolon himself admitted that he does not believe the U.S. Attorneys' office delayed the prosecution intentionally.  Tr. 21:24- 22:14.  Instead, he merely asserts it gained a "tactical advantage" by doing so based upon the prejudice he alleges.  Tr. 22:11-14.  As such, Mikolon has failed to meet his burden for dismissal.

### III. MOTION TO SUPPRESS

Mikolon argues the guns and ammunition seized from his truck following his arrest should be suppressed because he did not consent to a search of his vehicle.  Tr. 205:12-14.  He also disputes several other important factual statements made by the law enforcement officers.  He claims he was not carrying a bag containing a handgun at the time of his arrest.  Tr. 24:9-11.  Instead, he asserts he was carrying an air filter for his truck; and therefore did not have a gun on him when he was arrested. Tr. 24:13-18; 47:5-48:5.  Additionally, he says the door to his truck was closed at the time of his arrest, thereby concealing the guns from plain view and limiting his potential access to the passenger compartment.  Tr. 21:8-9; 204:12-16.  Finally, he claims he was approximately 10-15 feet away from his truck when he was arrested.  Tr. 204:11; 217:12-22.  Consequently, the truck and its contents were not within his immediate reach.  However, the Court does not find Mikolon or his version of events credible.  Further, the officers' testimony

12

was largely consistent as to the relevant facts, without appearing contrived.  They were each believable and their testimony appeared to be truthful accounts of their individual recollections of the events that occurred on November 18, 2008.

### A.    Consent

An exception to the warrant requirement is a search conducted pursuant to consent. *United States v. Silva-Arzeta*, 602 F.3d 1208, 1213-14 (10th Cir. 2010).  "A consent to search, however, is valid only if voluntary."  *United States v. McCurdy*, 40 F.3d 1111, 1119 (10th Cir. 1994).  The voluntariness of consent is a question of fact determined by the totality of the circumstances, with the government bearing the burden of proof.  *See Silva-Arzeta*, 602 F.3d at 1213-14 (citing *United States v. Zubia-Melendez*, 263 F.3d 1155, 1162 (10th Cir. 2001)); *United States v. Zapata*, 997 F.2d 751, 758 (10th Cir. 1993).  The government "must show that there was no duress or coercion, express or implied, that the consent was unequivocal and specific, and that it was freely and intelligently given."  *United States v. Carbajal-Iriarte*, 586 F.3d 795, 799 (10th Cir. 2009) (quoting *United States v. Soto*, 988 F.2d 1548, 1557 (10th Cir. 1993)).  "The central question is whether a reasonable person would believe he was free to . . . disregard the officer's request."  *Silva-Arzeta*, 602 F.3d at 1214 (quoting *United States v. Ledesma*, 447 F.3d 1307, 1314 (10th Cir. 2006) (internal quotation marks omitted)).  "The proper inquiry centers on whether the defendant suffered, inter alia, physical mistreatment, use of violence or threats of violence, promises or inducements, deception or trickery."  *Id.* at 1214 (quoting *United States v. Dozal*, 173 F.3d 787, 796 (10th Cir. 1999) (internal quotation marks omitted)).  Factors for consideration include, but are not limited to: 1) the location of the encounter; 2) whether any officer touched or physically restrained the defendant; 3) whether the officers were in uniform; 4) whether weapons were displayed; 5) the number, demeanor and tone of voice of the officers;

5) whether the defendant was advised of his or her right to terminate the encounter or refuse

consent; and 6) whether Miranda warnings were given.  *See Silva-Arzeta*, 602 F.3d at 1215

(citations omitted); *Carbajal-Iriarte*, 586 F.3d at 801 (citing *United States v. Thompson*, 546

F.3d 1223, 1226 (10th Cir. 2008) (quotation omitted)).

  In this case, Mikolon claims he did not consent to the search of his truck, while Deputy

Hefley claims he did.  The Court finds Deputy Hefley's testimony more credible and believes

Mikolon did, in fact, consent to the search.  In addition to Hefley's testimony, the fact that

Mikolon was immediately forthcoming as to where the guns were located in his truck supports a

finding that he consented to the search just prior to giving directions to Deputy Hefley about

where the guns could be found.  Furthermore, Mikolon claims that he called his friend, Daryl

Turner, a border patrol agent, to turn himself in.  Tr. 48:5-7.  He said that when he told Mr.

Turner where he was, he knew his friend would have to do his job and inform law enforcement.

Tr. 24:3-8.  Therefore, he was expecting "some form of law enforcement to show up" (tr.  24:6-

8), and was not caught by surprise when they did.  Tr. 23:22-25.  Consequently, if these

statements are true, then Mikolon's state of mind at that time was conciliatory and cooperative,

which is consistent with consent.  Finally, Mikolon's demeanor at the time of his arrest was

described by Deputy Franzoy as "very cooperative" explaining "[h]e didn't offer any resistance.

He was talking openly with Deputy Hefley and seemed to be very cooperative.  Just kind of

caught me."  Tr. 102:22-24.  Likewise, Deputy Hollister also described Mikolon as

"cooperative."  Tr. 126:25-127:2.  Deputy Hefley described Mikolon's demeanor during his

conversation with him by saying, "He was really calm.  He wasn't frustrated.  As a matter of

fact, I believe he had cigarettes or Copenhagen or snuff or something in the truck.  I asked him if

he wanted to take that with him.  He said sure."  Tr. 164:17-21.  Therefore, Mikolon's demeanor

at the time of his arrest also supports a finding of consent.[5]

The next consideration is whether Mikolon's consent was voluntary. This critical issue was only scantly addressed by the government.[6] Here, the factual circumstances are split. The arrest in this case was a highly charged scene with approximately eight to ten armed and uniformed deputies (tr. 193:24-25), descending upon Mikolon's campsite. The location, while a public park, was remote and sealed off from the public at that time. *See* tr. 143:10-14. There was only one non-law enforcement witness present, who was also briefly detained for his safety. Given the information provided to the deputies, it appeared Mikolon may have intended to engage them in a gunfight when they arrived. Therefore, initially, the deputies had their guns drawn and took cover. Deputy Hollister and Deputy Franzoy testified that they had their guns pointed at Mikolon as they approached. Deputy Hollister shouted orders at Mikolon to put his hands up, then to get down on the ground. Mikolon complied and was placed in handcuffs. Once Mikolon was in handcuffs, other deputies began a sweep of the area to make sure no other individuals were present and possibly dangerous. All of this took place within minutes of the deputies arrival on the scene. Once Mikolon was in handcuffs, and during the minute or two that it took Deputy Hollister and Deputy Franzoy to check his tent, Deputy Hefley approached Mikolon and asked him if he had any weapons, drugs or money in his truck. Mikolon said he did and gave consent to search his truck. Mikolon was not advised of his Miranda rights before

---

[5] During the hearing on this matter, the Court observed Mikolon's demeanor and noted that he was talkative and expressive. His gestures and expressions were somewhat animated. He also made lots of eye contact, smiled readily, and gave a "thumbs up" gesture to his counsel on multiple occasions. His demeanor was casual and open. At one point, he even made a joke about one of the U.S. Deputy Marshals in the courtroom. *See* tr. 47:18-19. Therefore, Mikolon's demeanor in court is consistent with his demeanor as described by the officers at the scene, thereby lending to the credibility of their testimony.

[6] Mikolon did not address the issue of voluntariness at all in light of his assertion that he did not give consent. However, it is also not his burden to prove involuntariness.

consent was requested, nor was he advised that he could refuse consent. *But see United States v. Davis*, 40 F.3d 1069, 1078 (10th Cir. 1994) ("The fact that officers do not specifically inform an individual that he or she has the right to refuse to consent to a search does not render that search coercive."); *McCurdy*, 40 F.3d at 1118 (an officer may search a vehicle pursuant to voluntary consent without first apprising the owner of his Miranda rights (citations omitted)).  These facts are indicative of an impliedly coercive scene with threats of physical violence made by the deputies pointing their guns at Mikolon only minutes before he gave consent.  Nevertheless, this does not end the Court's inquiry.

Individuals who are arrested and detained with handcuffs may give voluntary consent. *See Silva-Arzeta*, 602 F.3d at 1215 (consent of a handcuffed arrestee may be voluntary); *Dozal*, 173 F.3d at 796 ("Supreme Court and Tenth Circuit precedent establishes that consent to search may be voluntary even though the consenting party is being detained at the time consent is given." (brackets and internal quotation marks omitted)).  Here, despite the initial intensity of the scene, Mikolon admittedly was not surprised when the deputies arrived because he himself alerted them to his presence.  *See* tr. 23:22-25.  Mikolon's demeanor at the time of his arrest was "very cooperative" and "really calm."  *See* tr. 102:22-24; 126:25-127:2; 164:17-21. Furthermore, once Mikolon was handcuffed, there is no evidence or indication that any of the deputies were verbally or physically threatening towards him.  There is no evidence that he was mistreated in any way.  Deputy Hefley did not make any promises or inducements or employed deception or trickery to obtain Mikolon's consent.  On the contrary, Deputy Hefley appears to have been very courteous, even offering to get Mikolon's tobacco from his truck for him.  *See* tr. 164:17-21.  Finally, Mikolon knew that he did not have to consent to the search from his training as a former military police officer and prison guard.  Tr. 211:6-21.  He admitted, as a military

16

police officer, he was trained in search and seizure, and explained in detail how he was trained to obtain consent to search.  Tr. 211:13-18; 207:24-208:10.

Therefore, a review of the totality of the circumstances supports a finding that Mikolon's consent to search was not the product of duress or coercion.  Further, his consent was "unequivocal and specific, and . . . was freely and intelligently given."  *See Carbajal-Iriarte*, 586 F.3d at 799 (quotation omitted).  With his background and training, Mikolon clearly knew he was free to disregard Deputy Hefley's request to search his truck.  *See Silva-Arzeta*, 602 F.3d at 1214 (quotation omitted).  Moreover, his demeanor is inconsistent with someone being threatened or coerced.  Consequently, the Court finds that Mikolon voluntarily consented to the search of his truck; and therefore, the weapons and ammunition found therein were lawfully seized.

**B.    Automobile Exception**

The automobile exception to the warrant requirement applies if "there is probable cause to believe a vehicle contains evidence of criminal activity."  *Gant*, 556 U.S. at 347 (citing *United States v. Ross*, 456 U.S. 798, 820-21 (1982)).  If this standard is met, the police are authorized to "search of any area of the vehicle in which the evidence might be found."  *Id.*  "Probable cause to search a vehicle is established if, under the totality of the circumstances there is a fair probability that the car contains contraband or evidence."  *United States v. Jurado-Vallejo*, 380 F.3d 1235, 1238 (10th Cir. 2004). (quotation omitted).  "Probable cause is measured against an objective standard. . ."; although "an officer may draw inferences based on his own experience."  *Id.* (internal citations omitted).

Here, the deputies were given information from another law enforcement agency that Mikolon had "obtained weapons and ammunition" in Michigan before traveling to New Mexico.

Tr. 89:5-6; 89:22-90:2.  They were told he was "armed and dangerous" (tr. 159:25); and that

Mikolon said he would "not be taken alive."  Tr. 92:8.  Upon arriving at the scene, the door to

Mikolon's truck was open and two guns were visible in plain view– one in the driver's side door

pocket and another between the driver's seat and the center console.[7]  Furthermore, a gun was

found in the bag Mikolon was holding at the time of his arrest.  Tr. 30:1-6; 95:8-15; 162:2-3.

With this information and upon seeing the weapons in the truck, the deputies had sufficient

probable cause to believe Mikolon's truck contained evidence of criminal activity.  *See* tr. 131:7-

10; *cf. United States v. Beckstead*, 500 F.3d 1154, 1165 (10th Cir. 2007) (probable cause existed

to search an automobile where police received tip that car was involved in producing

methamphetamine, car was parked near home where meth lab was located and glassware

consistent with making meth was visible through the window of the car).  Consequently, their

search of the truck and compartments in which weapons and ammunition could be found,

including the tool box, was lawful pursuant to the automobile exception.

### C.    Search Incident to Arrest

In 2009, the Supreme Court held that a search of a vehicle incident to an arrest is lawful

"only if the arrestee is within reaching distance of the passenger compartment at the time of the

search; or it is reasonable to believe the vehicle contains evidence of the offense of arrest."

*Arizona v. Gant*, 556 U.S. 332, 351 (2009).  "When these justifications are absent, a search of an

arrestee's vehicle will be unreasonable unless police obtain a warrant or show that another

exception to the warrant requirement applies."  *Id.*  The *Gant* decision overruled 28 years of

---

[7]  The Court believes the officers' testimony that the door to Mikolon's truck was open.  *See* tr. 29:22-24;
92:11-13; 93:4-5; 100:7-15; 171:14-15; Gov. Ex. 4.  However, even assuming it was not open as claimed by
Mikolon, the gun located between the driver's seat and center console would have been visible by looking through
the window.  Tr. 128:13-15; 135:22-136:5.  Therefore, the position of the door does not substantially impact the
analysis.

legal precedent that began with *New York v. Belton*, 453 U.S. 950 (1981).  Prior to *Gant*, the

well-established Tenth Circuit precedent provided that "a police officer may conduct a

contemporaneous warrantless search of the passenger compartment of a vehicle incident to a

lawful arrest."  *United States v. Lacey*, 86 F.3d 956, 971 (10th Cir. 1996), *overruled by Gant,*

*supra*.  Such searches were lawful even when the arrestee was secured by law enforcement

outside and away from the vehicle.  *See, e.g., United States v. Brothers*, 438 F.3d 1068, 1973

(10th Cir. 2006), *overruled by Gant supra* (lawful search conducted while defendant handcuffed

and outside his vehicle); *United States v. Humphrey*, 208 F.3d 1190, 1202 (10th Cir. 2000),

*overruled by Gant, supra* (defendant's vehicle lawfully searched after he was handcuffed and

placed in a patrol car); *Lacey*, 86 F.3d at 971 (lawful search where defendant handcuffed, placed

on the ground and the door to his van was closed).

        In this case, Mikolon was arrested and handcuffed outside the vehicle.  He was detained

by two officers (tr. 99:25-100:3), and had been moved further away from the truck at the time of

the search.  *See* tr. 101:20-22.  Therefore, Mikolon was not within reaching distance of the

passenger compartment of his truck at the time of the search.

        Furthermore, Mikolon was arrested on a warrant for failure to appear.  The government

argues it would be reasonable for the deputies to search Mikolon's truck to find evidence of this

offense, including "receipts that would demonstrate his route of flight, and or documents or other

evidence establishing identification."  (Doc. 31 at 4.)  The Court disagrees.  First, the deputies

themselves testified that they were there only to get the "body," not investigate a case.[8]  Tr.

---

[8] Specifically, Deputy Hefley testified: "I'm not investigating his case. I'm not investigating any case that charges him with -- that's not our practice. All we're there is for the body. And I wasn't going to further any investigation as to what West Virginia was doing or anybody else."  Tr. 178:14-18.

132:18-21; 178:14-18.  The officers admittedly did not search Mikolon's truck for evidence

related to the offense of failing to appear.  *Id.*  Second, the type of evidence identified by the

government is only tangentially relevant, if at all, to the charge of failing to appear.  Little more

than proof of notice and finding Mikolon in another state, as in this case, is all that is needed to

support a conviction.  Receipts concerning Mikolon's travel pattern is irrelevant.  Here, although

a search of Mikolon's truck for receipts and identification did not occur, any such search would

likely have been a pretext undermining the clear intent of *Gant* to eliminate *carte blanche*

searches premised on strained hypothetical scenarios regarding the preservation of evidence.

Consequently, the Court finds the search of Mikolon's truck does not satisfy the requirements of

*Gant, supra*.

   However, the deputies' search of Mikolon's truck incident to his arrest does, in fact,

satisfy the less stringent requirements for automobile searches in place at the time of the search

in 2008– before *Gant* was decided.  The deputies acted in good faith in accordance with the

well-established law at that time.  In *Davis v. United States*, 131 S.Ct. 2419, 2423-24 (2011),

the Supreme Court reviewed an automobile search conducted in 2007 in which the occupants of

the vehicle were handcuffed and placed in a patrol car while the search was conducted.  The

search was initially determined to be lawful by the district court.  The Supreme Court issued its

decision in *Gant* while the appeal was pending.  On appeal, the Eleventh Circuit found that the

search violated the Fourth Amendment pursuant to *Gant*, but affirmed the district court's

decision applying the good faith exception.  The Supreme Court agreed with the Eleventh Circuit

and held that, "searches conducted in objectively reasonable reliance on binding appellate

precedent [that is later overruled] are not subject to the exclusionary rule."  *Davis v. United*

*States*, 131 S.Ct. 2419, 2423-24 (2011).  Likewise, this Court finds the good faith exception to

the exclusionary rules applies.  The deputies acted in good faith reliance upon existing appellate precedent; and therefore the evidence seized from Mikolon's truck will not be excluded.[9]

### D.  Inevitable Discovery

Although there are ample reasons not to suppress the evidence seized from Mikolon's truck, the final argument raised by the government is that the guns and ammunition would have inevitably been discovered during Ranger Sanchez's inventory search of the vehicle before it was towed away.  *See United States v. Cunningham*, 413 F.3d 1199, 1203 (10th Cir. 2005) (citations omitted) ("The inevitable discovery doctrine provides an exception to the exclusionary rule and permits evidence to be admitted if an independent, lawful police investigation inevitably would have discovered it.")  This argument has merit.

It is the U.S. Marshals' policy to assign the impoundment of vehicles to state and local authorities.  Tr. 130:4-8; Gov. Ex. 5.  In this case, Deputy Hollister followed the policy and asked Ranger Sanchez to inventory and tow Mikolon's vehicle.  Tr. 131:3-10;138:1-2.  Ranger Sanchez then conducted an inventory search of the truck in accordance with the New Mexico State Parks Law Enforcement policy on inventory searches; and contacted a local tow company to retrieve the truck.  Tr. 143:19-145:19; Gov. Ex. 6.  Ranger Sanchez conducted a thorough inventory of the truck, and testified that if a firearm had been in the vehicle during his search, he

---

[9] Defendant moved to "suppress all evidence seized from his vehicle. . .".  (Doc. 14 at 1.)  He denied carrying the yellow bag that contained a weapon claiming, instead, that he was carrying an air filter.  Therefore, in keeping with his version of events, Mikolon did not move to suppress the gun found in the bag that he was carrying.  Consequently, this issue was not raised and is not before the Court.  Nevertheless, in making its credibility determinations and assessing the evidence as a whole, the Court finds that Mikolon was carrying a bag at the time of his arrest, not an air filter.  Not only does the Court find the deputies' testimony on this issue credible, but it also notes that there is no evidence regarding the presence of an air filter other than Mikolon's own testimony, including in the photographs of the scene.  Multiple officers testified that the bag Mikolon was carrying was removed from his hand, searched and found to contain a gun.  Consequently, the search of the bag that was in Mikolon's possession and immediate control, is a lawful search incident to arrest pursuant to *Chimel v. California*, 395 U.S. 752 (1969) and its progeny.

would have found it.  Tr. 147:5-10.  Therefore, if the deputies had not seized the guns and

ammunition from Mikolon's truck, Ranger Sanchez would have inevitably discovered them

during his inventory search.  *See United States v. Martinez*, 512 F.3d 1268, 1273 (10th Cir. 2008)

(citations omitted) (evidence is admissible if an independent, lawful police investigation would

have discovered it).  Consequently, the inevitable discovery doctrine also provides an exception

to the warrant requirement in this case.

### E.      Statements

Mikolon seeks to suppress "any statements he made on November 18, 2008."  (Doc. 14 at

1; Doc. 32 at 8.)  Specifically, he seeks to suppress "his statements to [Deputy] Hefley"[10] (Doc.

32 at 8), arguing "those statements must be suppressed as fruit of the poisonous tree because

they were obtained in violation of Mikolon's rights under Miranda."  (Doc. 32 at 9.)  It is

undisputed that Mikolon was not advised of his Miranda rights before Deputy Hefley asked him

if he had "any other items in his truck, weapons, money, drugs, anything like that."  Tr. 163:8-9;

*see* tr. 36:14-37:4; 132:5-10; 166:21-167:2; 169:3-5; 205:7-11.  Mikolon responded that "he had

weapons in the truck."  Tr. 163:11.  Deputy Hefley then asked, "Do you mind if I go ahead and

go inside and get those weapons? And [Mikolon] said, No."  Tr. 163:12-13; 164:13-14.  Mikolon

then gave Deputy Hefley directions to where the guns were located in his truck, including in the

toolbox in the bed of the truck.  Tr. 31:18-21; 49:18-22; 101:17-19; 164:22-23; 165:6-9; 207:13-

17; 208:7-10.  Deputy Hefley testified he asked about guns for officer and public safety

---

[10] The government reports in United States' Response to Defendant's Motion to Suppress, that Mikolon volunteered statements to Deputy French while he was being transported to the Doña Anna County Detention Center.  (Doc. 18 at 7.)  According to the government, these alleged statements were volunteered by Mikolon, and not made in response to police questioning or interrogation.  *Id.*  Mikolon does not challenge the admission of these alleged statements.  No evidence was presented at the hearing regarding these alleged statements, and no mention of them was made by Mikolon in his briefs.  Therefore, this decision concerns only the statements made by Mikolon to Deputy Hefley as discussed in Mikolon's closing argument (Doc. 32 at 10-12), and raised at the hearing.

reasons.[11]  Tr. 117:6-22; 163:8-24.

In response to Mikolon's argument, the government states that it "will not seek to introduce statement(s) made by the Defendant at the arrest scene immediately after his arrest." (Doc. 18 at 7.)  The government made no further statements or arguments with respect to the admissibility of Mikolon's statements.  The government did not concur in Mikolon's legal analysis.  Therefore, despite voluntarily refraining from admitting Mikolon's statements to Deputy Hefley, the legal issue raised by Mikolon is unresolved and ripe for review.  *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) ("[A] defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of that practice.").

The Supreme Court has recognized a public safety exception to Miranda.  *New York v. Quarles*, 467 U.S. 649 (1984); *see United States v. Lackey*, 334 F.3d 1224, 1227-28 (10th Cir. 2003) ("questions necessary to secure [officer] safety" are included in the public safety exception).  In *Quarles*, the Supreme Court considered factual circumstances similar to the facts at issue in this case.  There, upon stopping the defendant, an officer frisked him and discovered he was wearing an empty shoulder holster.  After handcuffing the defendant, the officer asked him where the gun was.  The defendant nodded in the direction of the gun and said, "the gun is over there."  467 U.S. at 652.  At the time, the defendant was surrounded by at least four officers.  *Id.* at 655.  The Supreme Court examined whether the officer should have first advised the defendant of his Miranda rights before asking him where the gun was.  The Court concluded

---

[11] Although Deputy Hefley testified that he asked Mikolon whether he had "weapons, money, drugs anything like that. . ." (tr. 163:8-9); when explaining the reason he asked this question, he expressed a concern for officer and public safety with respect to the guns only.  *See* tr. 163:8-24.  There was no testimony or other evidence with respect to safety issues arising from the potential presence of money or drugs.

that "the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination." *Id.* at 657. Therefore, it held "there is a 'public safety' exception to the requirement that Miranda warnings be given before a suspect's answers may be admitted into evidence, and that the availability of that exception does not depend upon the motivation of the individual officers involved." *Id.* at 655-56.

Following *Quarles*, this Court finds Deputy Hefley's question to Mikolon about whether he had any guns in his truck raises a legitimate concern for officer and public safety. Here, Deputy Hefley had information prior to Mikolon's arrest that he was "armed and dangerous" (tr. 159:25, 163:20-21), and had obtained multiple weapons and ammunition. *See* tr. 89:5-8. A gun was also found in the bag Mikolon was carrying at the time of his arrest. Tr. 30:1-6; 95:8-15; 162:2-3. Therefore, Deputy Hefley's question was reasonably prompted by a legitimate concern for public safety. *See, e.g., Quarles*, 467 U.S. at 657 ("So long as the gun was concealed somewhere in the supermarket, with its actual whereabouts unknown, it obviously posed more than one danger to the public safety: an accomplice might make use of it, a customer or employee might later come upon it."). The fact that Mikolon was handcuffed and in police custody does not negate the public safety concern because the guns may still have been accessible to the public– especially the guns in plain view. *Id.* at 652-55. Consequently, Deputy Hefley was not required to advise Mikolon of his Miranda rights before asking if he had weapons in his truck.

Deputy Hefley's question with regard to money and drugs, however, does not fall within the same public safety exception. Here, there is no evidence that Deputy Hefley asked about the presence of money or drugs to protect the officers or public from potentially imminent harm.

24

Although drugs certainly pose a danger to the public, they do not pose the same imminent threat as weapons.  The same exigency is not present.  *See Quarles*, 467 U.S. at 658-59 (discussing the public safety exception in terms of the exigency of the circumstances presented). Consequently, the Court finds that Deputy Hefley should have advised Mikolon of his Miranda rights before asking him whether he had money or drugs in his truck.  Because he failed to do so, Mikolon's statement with respect to possible money and drugs must be suppressed.

Finally, the Court considers Mikolon's other statements made to Deputy Hefley.  First, as discussed above, Deputy Hefley was authorized to ask for consent to search Mikolon's truck without running afoul of Miranda.  *See McCurdy*, 40 F.3d at 1118.  Therefore, Mikolon's statement giving consent will not be suppressed.  Second, Mikolon admitted that his statements to Deputy Hefley about where the guns could be found in his truck were volunteered statements (*see* tr. 31:18-21; 49:18-22; 101:17-19; 164:22-23; 165:6-9; 207:13-17; 208:8-10), not made in response to custodial interrogation.  Therefore, these statements also will not be suppressed.  *See Arizona v. Mauro*, 481 U.S. 520, 529 (1987) ("Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence."); *Miranda v. Arizona*, 384 U. S. 436, 478 (1966) ("Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today." (quotation omitted)).

IT IS THEREFORE ORDERED that Defendant Mikolon's Motion to Dismiss for Violation of the Interstate Agreement on Detainers Act (Doc. 15) and Defendant Mikolon's Motion to Dismiss for Pre-Accusatory Delay (Doc. 24) are hereby DENIED;

IT IS FURTHER ORDERED that Defendant Mikolon's Motion to Suppress (Doc. 14) "all evidence seized from his vehicle" is hereby DENIED; and

25

        IT IS FURTHER ORDERED that Defendant Mikolon's Motion to Suppress (Doc. 14)

"any statements [Mikolon] made on November 18, 2008," is GRANTED with respect to

Defendant Mikolon's statement to Deputy Hefley regarding the presence of money or drugs in

his vehicle only; and is DENIED with respect to all other statements made by Mikolon on

November 18, 2008.

        DATED: February 14, 2012.


                                        _____
                                        MARTHA VÁZQUEZ
                                        UNITED STATES DISTRICT JUDGE